# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **GREG BALTIMORE, ET AL.,** | ) | |
| | ) | **CONSOLIDATED** |
| **Plaintiffs,** | ) | **No. 3:06-0578** |
| | ) | **No. 3:06-0579** |
| **v.** | ) | **No. 3:06-0580** |
| | ) | **JUDGE ECHOLS** |
| **CITY OF FRANKLIN,** | ) | |
| | ) | |

## MEMORANDUM

Pending before the Court are Defendant City of Franklin's ("the City's") Motion For Summary Judgment As To Plaintiff Greg Baltimore (Docket Entry No. 37) and Motion For Summary Judgment As To Plaintiff Rick Cotton (Docket Entry No. 60), to which the Plaintiffs have responded in opposition and the City has filed replies.[1]

Plaintiffs Greg Baltimore ("Baltimore") and Rick Cotton ("Cotton") are African American firefighters employed by the Franklin Fire Department (the "Fire Department"). Baltimore holds the rank of Captain and Cotton holds the rank of Lieutenant. They filed these actions against the City on June 6, 2006. Although the facts alleged by each Plaintiff are different, both Plaintiffs claim that the City discriminated against them because of race in failing to promote them to higher positions within the Fire Department, in violation of 42 U.S.C. § 1981 (Count One); that the City subjected them to racial discrimination and retaliation in the promotion process and by requiring them to work in a racially hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Count Two); and that the City deprived them of

---

[1]The third case in this consolidated matter, <u>Sanford v. City of Franklin</u>, No. 3:06-0579, was voluntarily dismissed. (Docket Entry No. 33.)

1

employment opportunities because of their race in violation of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* (hereinafter "THRA") (Count Three). Plaintiffs seek compensatory and punitive damages, front pay, back pay, injunctive relief, attorney's fees, costs, and prejudgment interest.

Baltimore filed charges of discrimination and/or retaliation against the City with the Equal Employment Opportunity Commission ("EEOC") on January 20, 2005, March 30, 2005, and January 24, 2006. Cotton filed charges of discrimination and/or retaliation against the City with the EEOC on June 28, 2005 and October 24, 2006. (Docket Entry No. 59, Stipulations of Parties.) After investigating these charges, the EEOC issued notices of right to sue to Baltimore and Cotton for all of their charges on June 2, 2006, and these timely lawsuits followed.

Because these cases are fact-intensive, the Court will discuss only those facts necessary to address the issues raised by the City in its Motions For Summary Judgment.

## I. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

2

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. ANALYSIS

### A. Section 1981 claims

The Court agrees with the City that Baltimore and Cotton fail to state a claim under § 1981. Cotton concedes that he fails to state a claim. (Docket Entry No. 70, Plaintiff's Response at 1.) Although § 1981 confers certain rights, the statute itself does not provide a cause of action for race discrimination. In Jett v. Dallas Independent School Dist., 591 U.S. 701, 733 (1989), the Supreme Court held that 42 U.S.C. § 1983 provides the exclusive remedy for §1981 claims brought against a municipality. In 1991, Congress amended § 1981 to add subsection (c) which states: "The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

Subsequently, the question arose in the federal courts whether this statutory amendment abrogated Jett and created an implied cause of action for § 1981 claims for race discrimination

3

against municipalities.  See Arendale v. City of Memphis, 2006 WL 3053402 at * 4-6 (W.D. Tenn. 2006); Powell v. City of Pittsfield, 143 F.Supp.2d 94, 111 (D.Mass. 2001).  In the Sixth Circuit this question has not been resolved by the court of appeals, but district courts continue to follow Jett. See e.g. Arendale, 2006 WL 3053402 at *5; Baker v. Shelby County Gov't, 2006 WL 2927687 at *2 (W.D. Tenn. 2006); Hayes v. City of Memphis Police Dept., 2006 WL 2882682 at *4 (W.D. Tenn. 2006); Lowery v. City of Cleveland, 2006 WL 2010837 at **3-4 (N.D. Ohio 2006); Johnson v. City of Franklin, 2005 WL 1661975 at *5 (W.D. Ky. 2005).

In line with these cases, the Court determines that, because Baltimore and Cotton did not plead a cause of action of under § 1983, their § 1981 claims against the City are barred under Jett. The City is entitled to summary judgment on the § 1981 claims.

## B.  Baltimore's hostile work environment claim

Baltimore's three EEOC charges did not expressly assert a hostile work environment claim under Title VII.  The only statements in the charges potentially relevant to a hostile work environment claim were made in the first EEOC charge concerning racial discrimination in promotion that was alleged to have occurred between July 31, 2004 and January 13, 2005.  In that charge, Baltimore complained about the City's failure to promote him to Chief in July 2004 and the City's removal of his name from a promotion list for Deputy Chief on January 13, 2005.  Baltimore then stated:  "Around this same time, July 2004, it became known to me that a racial comment was made by a department head in a meeting attended by the city administrator.  Nothing was done to the department head as he made the comment 2-3 times during the meeting." (Docket Entry No. 59, Stipulations of Parties, Ex. A, Baltimore EEOC Charge January 20, 2005.)  The EEOC charge did not specify the substance of the comment or whether it even pertained to Baltimore.

4

In his Complaint, Baltimore alleged that he sought promotion to the rank of Chief in 2004 and "[d]uring a meeting of City Officials, wherein Plaintiff's request to be promoted to the position of Chief was discussed, a racially derogatory statement was made by decision makers about not having a 'rug head' run the department, specifically referring to Plaintiff's race."[2]  (Docket Entry No. 1, Complaint at ¶¶ 15-16.)  The Complaint clearly links the "rug head" comment to Baltimore's quest for promotion to the rank of Chief in 2004.  Further, Baltimore testified at his deposition that the "rug head" comment was made by City Engineer, Dave Parker, about Baltimore and his desire to be Chief.  (Docket Entry No. 39, Baltimore Depo. at 70-71.)

In paragraphs 22 through 24 of the Complaint, Baltimore alleges that he and other African American firefighters were subjected to a racially hostile work environment, listing a number of racially derogatory statements and epithets allegedly made in the workplace.  None of the incidents described in paragraphs 22 through 24 of the Complaint were included in Baltimore's EEOC charges.  The "rug head" comment is not repeated in paragraphs 22 through 24 of the Complaint as supportive of Baltimore's claim of a hostile work environment.  The City contends the only racial remark that the EEOC could have investigated based on Baltimore's charge was the "rug head" comment, and that statement was clearly linked to his desire to be promoted to Chief.  Because Baltimore did not provide the EEOC with the same list of racially derogatory statements and epithets indicating the existence of a hostile work environment at the Fire Department as listed in the Complaint, the City contends Baltimore failed to exhaust his administrative remedies and this Court lacks jurisdiction to consider Baltimore's hostile work environment claim.

---

[2]Although some question is raised in the record whether the term was "rag head" and whether the term refers to an African American, for purposes of summary judgment the Court will assume in Baltimore's favor that the comment was racially derogatory towards him.

5

"It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." Strouss v. Michigan Dept. of Corrections, 250 F.3d 336, 342 (6th Cir. 2001); Tartt v. City of Clarksville, 149 Fed.Appx. 456, 460-461 (6th Cir. 2005). Here, a hostile work environment claim would not reasonably be expected to grow out of Baltimore's January 20, 2005 EEOC charge. See King v. Tecumseh Public Schools, 229 F.3d 1152, 2000 WL 1256899 (6th Cir. 2000) (unpublished) (observing sex discrimination and sexual harassment claims are not alike or reasonably related unless there is a factual relationship between them; plaintiff failed to allege facts in EEOC charge to prompt EEOC to investigate sexual harassment claim).

The facts related in the January 2005 charge would not have prompted the EEOC to investigate a hostile work environment claim and, in fact, the EEOC was not prompted to investigate beyond the comment alleged. An EEOC investigation would have been aimed at determining the substance of the comment alleged, who made it, in what context and why, who else was present to hear the comment, and whether any disciplinary action was taken. As confirmed by Baltimore's later Complaint, upon investigation the EEOC would have learned that the department head's comment about "not having a 'rug head' run the department" related to Baltimore's application to be Chief of the Fire Department. The EEOC would not have been prompted to investigate other racially derogatory statements and epithets used as to African Americans in general throughout the Fire Department as a whole. See Davis v. Sodexho, Cumberland College Cafeteria, 157 F.3d 460, 463 (6th Cir. 1998). If, as Baltimore alleges, the Fire Department was permeated for years with

6

severe and pervasive racial harassment, he had adequate opportunity to bring his concerns to the attention of the EEOC in one or more of the three charges he filed, but he did not do so.

Baltimore points the Court to portions of the EEOC file to support his contention that the EEOC was on notice to investigate a hostile work environment claim. (Docket Entry No. 67, Ex. 11.) These EEOC documents, however, do not support Baltimore's position. In a written statement and in an interview with an EEOC investigator, Baltimore mentioned only the "rug head" comment in connection with his application for Chief and reported that the department head made the comment two or three times in one meeting. (Id. at 12, 14.) Further, the EEOC investigator informed Baltimore in a letter dated May 17, 2006:

> 3. With respect to the alleged racial comment made by a department head, you admit that you did not hear the comment(s) directly, the incident was reported to the mayor, the mayor issued a letter of apology to the African-American firefighters, the person who made the alleged comment(s) was verbally admonished, and there have been no further incidents after it was reported. No violation is found under Title VII of the Civil Rights Act of 1964, as amended.

(Id. at 5.) Baltimore's EEOC charge did not prompt the EEOC to look beyond the single offensive "rug head" comment that was alleged to have occurred. Because the Court lacks subject matter jurisdiction over Baltimore's Title VII hostile work environment claim, the Court concludes that the City is entitled to summary judgment on that claim.

Similarly, Baltimore's hostile work environment claim brought under the THRA is time-barred. Such a claim is subject to a one-year statute of limitations that is not tolled while administrative charges are pending. Tenn. Code Ann. § 4-21-311(d); George v. Aventis Pharmaceutical, Inc., 252 F.Supp.2d 599, 607 (W.D. Tenn. 2003); Pearison v. Pinkerton's, Inc., 2003 WL 21212651 at *4-5 (E.D. Tenn. 2003). Because Baltimore filed suit on June 6, 2006, he must identify acts constituting a racially hostile work environment under state law occurring in the

7

year prior to that date. Baltimore did not respond to the City's limitations argument concerning his THRA claim; thus, he has not produced evidence to show that his THRA claim should survive summary judgment. The City is entitled to summary judgment on the THRA hostile work environment claim.

## C. Discrete acts of discrimination alleged by Baltimore

Before bringing suit under Title VII for discrete acts of racial discrimination or retaliation, Baltimore was required to file timely charges with the EEOC within 300 days of each discrete discriminatory or retaliatory act at issue or lose his ability to recover for that act. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002). Each decision to deny Baltimore a promotion is a discrete act which "occurred" on the day the event "happened." See id. Likewise, under the THRA, Baltimore was required to bring claims of discrete acts of racial discrimination within one year. Tenn. Code Ann. § 4-41-311(d).

### 1. Lieutenant promotion in 2000

Baltimore alleged in the Complaint that he sought promotion to the rank of Lieutenant in 1999. (Docket Entry No. 1, Complaint ¶ 13.) The promotion process actually occurred in 2000, and Baltimore was promoted to Lieutenant effective August 28, 2000. (Docket Entry No. 67, Ex. 4.) He appears to claim that he should have been promoted to Lieutenant earlier in 2000 when two Caucasian firefighters and one African-American firefighter were promoted to that rank because he had more training than they did.

As the City contends, Baltimore's claim for this alleged discrete act of discrimination is time-barred under the applicable statutes of limitations. Baltimore did not file a charge with the EEOC

8

under Title VII within 300 days after this act of failure to promote occurred in 2000. Baltimore's first EEOC charge was not filed until January 20, 2005. Under the THRA, Baltimore was required to file a lawsuit challenging the 2000 failure to promote him no later than 2001.

Baltimore asserts, however, that his claim is still timely under a continuing violation theory. While the Supreme Court in <u>Morgan</u> has "greatly limited the viability of a continuing violation theory[,]" <u>Sherman v. Chrysler Corp.</u>, 47 Fed. Appx. 716, 720 (6th Cir. 2002), <u>Morgan</u> does not implicate the second continuing violation exception recognized in the Sixth Circuit; that is, where the plaintiff can show a longstanding and demonstrable policy of discrimination. <u>Bell v. Ohio State Univ.</u>, 351 F.3d 240, 247-248 (6th Cir. 2003); <u>Sharpe v. Cureton</u>, 319 F.3d 259, 267 (6th Cir. 2003). In opposition to the summary judgment motion, Baltimore provided substantial testimonial and documentary evidence tending to show that Fire Department officials engaged in a longstanding and demonstrable policy of discrimination in promotions against African American firefighters in favor of Caucasian firefighters. Because Baltimore timely filed this lawsuit after receiving a Notice of Right to Sue letter concerning his three EEOC charges, the Court concludes that all alleged acts of racial discrimination and retaliation that occurred prior to the filing of this suit may be heard in this suit based upon the Sixth Circuit's second continuing violation exception that has not been implicated by <u>Morgan</u>.

As to Baltimore's THRA claim, the Tennessee Supreme Court, like the Sixth Circuit, has adopted the continuing violation exception for a longstanding and demonstrable policy of discrimination. <u>Spicer v. Beaman Bottling Co.</u>, 937 S.W.2d 884, 889-890 (Tenn. 1996). For the same reasons stated above, Baltimore's claims under the THRA are also timely brought.

The City next argues that Baltimore cannot satisfy two elements of his *prima facie* case of race discrimination. To demonstrate a *prima facie* case based on failure to promote, Baltimore must show that (1) he is a member of a protected class; (2) he applied for, and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time his request for the promotion was denied. See White v. Columbus Metropolitan Housing Auth., 429 F.3d 232, 240 (6th Cir. 2005). The City contends Baltimore cannot prove that he did not receive the job for which he applied. He does not contest that he was promoted to Lieutenant in 2000. Even if he could make a plausible argument that he should have been promoted a few months earlier in 2000, he still cannot show the fourth element because a person in Baltimore's protected class, Rick Cotton, was promoted to the position a few months before Baltimore.

The Court concludes that Baltimore has generated a genuine issue of material fact for trial on whether he should have received a promotion to Lieutenant earlier in 2000. That Cotton, an African American, received a promotion ahead of Baltimore does not end the inquiry because two Caucasian firefighters were also promoted at the time Cotton was. Baltimore claims he was as qualified or more qualified than those candidates. Consequently, the City is not entitled to summary judgment on this discrete claim of failure to promote brought under Title VII and the THRA.

*2. Captain promotion in 2002*

Baltimore claims that he was denied a promotion to the rank of Captain in 2002. He applied for the position and was placed second on the certification list based on his score attained during the promotional process. Eddie House, a Caucasian, was placed first on the list and was promoted on September 30, 2002.

10

The City is correct that recovery for this claim under Title VII and the THRA is time-barred under the applicable statutes of limitations. Baltimore did not file an EEOC charge within 300 days of the event; thus Title VII coverage is precluded. Baltimore did not file suit under the THRA within one year after House was promoted.

As explained above, however, these claims are not time-barred under the second continuing violation theory accepted in federal and state law. Bell, 351 F.3d at 247-248; Spicer, 937 S.W.2d at 889-890. The City does not argue that Baltimore cannot satisfy the elements of his *prima facie* case. Baltimore presented evidence through former Human Resources Director Judith Looney that former Fire Chief Don Claiborne told her his first choice for Captain in 2002 was Eddie House, even before the promotion process was finished. (Docket Entry No. 67, Looney Depo. at 70.) Looney tried to encourage Chief Claiborne to promote Baltimore to diversify the Fire Department and because he was the only candidate with a B.S. degree. Chief Claiborne was opposed to her idea because he thought Baltimore was disloyal. (Id. at 72-73.) Looney testified that the only time she felt an African American should have been selected and was not was then Baltimore was not chosen for Captain in 2002. (Id. at 90.) Because a jury must decide whether Baltimore's race played a role in the denial of his promotion to Captain in 2002, the City is not entitled to summary judgment on these claims.

### 3. Chief selection in 2004

This claim is timely under Title VII because Baltimore filed an EEOC charge on January 20, 2005 concerning the Chief appointment. As the City suggests, the claim would be time-barred under the THRA because Baltimore did not file suit within one year after Rocky Garzarek was appointed

11

Fire Chief on September 20, 2004.  However, the THRA claim is timely under the second continuing violation theory.  See Spicer, 937 S.W.2d at 889-890.

According to Baltimore, in May 2004, the City took applications for the position of Fire Chief, which was vacated by Chief Don Claiborne.  (Docket Entry No. 67, Ex. 7.)  Baltimore submitted his name and resume to be considered for the position.  (Docket Entry No. 39, Baltimore Depo. at 62.) City Administrator Jay Johnson screened the Chief applications and divided them into stacks A, B & C, with "A" being the most qualified candidates, "B" the second-most qualified and "C" the least qualified.  When Baltimore learned his application was not in the "A" stack, he questioned Johnson about his status, and Johnson told him that his application had been placed in the "B" stack because he had not previously served as a fire chief elsewhere.  (Id. at 62-64.)

The City contends that Baltimore cannot establish he was qualified for the position of Chief. At the time the position was advertised and filled in mid-2004, Baltimore held the rank of Lieutenant and had not yet been promoted to Captain.  The posted job announcement for Chief included minimum requirements: a bachelor's degree in Fire Science, Business Administration or Public Administration, and a master's degree was preferred.  (Docket Entry No. 39, Baltimore Depo. at 77-78.)  Baltimore had a bachelor's degree, but not in the areas mentioned, and he did not have a master's degree.  Minimum requirements also included five (5) years' service as Chief, Assistant Chief, Battalion Chief or Deputy Chief in a paid fire department.  Baltimore admitted that he did not have such experience.  (Id. at 78.)   Baltimore testified he had completed some of the training courses required, but he had never heard of others mentioned in the job posting.  (Id. at 78-80.)  He was also unfamiliar with the minimum physical requirements of the Firefighter Professional

12

Qualification Code as published by the National Fire Protection Association and mentioned in the job posting.  (Id. at 80.)

Baltimore flatly admitted that he did not have the qualifications for Chief as stated in the job posting.  (Id. at 81.)  He further conceded that the job posting did not permit substitution of any equivalent experience, with the exception of graduation from the National Fire Academy, Executive Fire Officer Course or Senior Service Course.  (Id. at 82-83.)  He testified, however, that he thought he was qualified to be Chief because he had equivalent experience and because the qualifications listed in the job posting had not been used before in selecting a Fire Chief.  Chief Claiborne, also chosen for the position by City Administrator Johnson, had none of the qualifications listed in the job posting.  Rather, Claiborne had a GED and was promoted from Captain to Chief in 1995, skipping the rank of District Chief.  Baltimore testified he had been a member of the Fire Department for 15 years, he "had done the job," he had served as an Assistant Chief in the absence of the Assistant Chiefs, and he knew the day-to-day operations.  (Id. at 82.)  He also suggests that Johnson's failure to discipline City Engineer Dave Parker after he made the "rug head" remark in a departmental meeting indicates racial bias against Baltimore.

"Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates," and so long as an employer's reasons are not discriminatory, an employer is free to chose among qualified candidates.  Wrenn v. Gould, 808 F.2d 493, 502 (6th Cir. 1987) (and cases cited therein).  Employers are not rigidly bound by the language in a job description, particularly when the position being filled is one in management, Bush v. Gambro Healthcare, Inc., 2006 WL 316871 at *10 (M.D. Tenn. 2006), and "[a]n employer has even greater flexibility in

choosing a management-level employee, as is the case here, because of the nature of such a position." Id.

Despite the qualifications outgoing Chief Claiborne may have possessed, the City was free to devise a list of qualifications required when choosing a new Fire Chief in 2004. The important comparisons are whether Baltimore can show that he was qualified for the Chief position as then described and whether an individual of similar qualifications who was not a member of the protected class received the job at the time Baltimore's request for the promotion was denied. See White, 429 F.3d at 240. The City's evidence shows that the chosen Caucasian candidate, Rocky Garzarek, was highly qualified to assume the Chief's position, particularly because he had served in high level management positions in other fire departments. (Docket Entry No. 42, Johnson Depo. at 75.) Baltimore makes no attempt to compare his qualifications as of July 2004 with Garzarek's to show that there is a jury question whether Baltimore was as qualified or more highly qualified than Garzarek. Baltimore's perception of his own competence, and the lesser competence of those competing against him, is irrelevant because the search committee's perceptions and motivations are key. See Bush, 2006 WL 316871 at *10.

Although Baltimore points to the racial remark made by Dave Parker at a departmental meeting as evidence of racial bias against him for the Chief's position, Baltimore makes no showing that Parker had any supervisory authority over him or that Parker had the ability to influence the City's decision on who would be chosen for Chief. Moreover, Parker's comment does not establish racial animus on the part of Johnson, Baltimore's ultimate supervisor and the decision-maker concerning the Chief's job. Johnson testified that upon hearing the comment, both he and Human Resources Director, Judith Looney, admonished Parker to "stop it" or "drop it" because "that's

14

improper." (Johnson Depo. at 25.) Johnson then held a very short discussion to state that "we just don't do that. We hire the best people. And we went on with the meeting." (Id.) Baltimore has not met this evidence with contradictory proof showing that Parker's comment influenced the decision-making process for Chief.

For these reasons, the Court concludes that Baltimore has not carried his burden on summary judgment to produce evidence on the second and fourth elements of his *prima facie* case. Accordingly, the City is entitled to summary judgment on Baltimore's claim that he was wrongly denied the Chief's appointment in July 2004.

### 4. *Deputy Chief promotion in 2005*

After taking over in 2004, Fire Chief Rocky Garzarek reviewed the job description for Deputy Chief and determined that the minimum experience for the position should be "3 years with the Franklin Fire Department as a Captain or higher rank[.]" (Docket Entry No. 53, Garzarek Aff. ¶3.) Garzarek felt that the 3-year requirement was necessary because the management experience of a Captain, as a middle-level manager, was a necessary prerequisite to qualification for Deputy Chief. Also, the position of Captain brings more respect, has more management responsibilities, and requires tougher decisions than lower ranks such as Lieutenant. (Id. ¶¶ 4-5 Docket Entry No. 51, Ex. G, Deputy Chief Job Description.) Garzarek determined that allowing persons to skip ranks and qualify for Deputy Chief, without serving as Captain for three or more years, was not in the best interest of the Fire Department.[3] Garzarek was not aware that, before he became Fire Chief, other persons were allowed to skip ranks and qualify for Deputy Chief and other positions. (Id. ¶¶ 6-7.)

------

[3]Former Fire Chief Don Claiborne testified that in his opinion, the Fire Department was not disadvantaged by allowing employees to skip ranks in the promotional process. (Docket Entry No. 67, Ex. 15, Claiborne Depo. at 29.)

15

On December 8, 2004, the Fire Department posted the position of Deputy Chief. (Docket Entry No. 51, Wetmore Aff. ¶ 2; Ex. A.) Among other minimum qualifications, the job posting required a "minimum 3 years with [the] Franklin Fire Department as a Captain or higher, <u>or any equivalent combination of education, specialized training and experience</u>." (Docket Entry No. 67, Ex. 8 (emphasis added).)

At the time, Assistant City Administrator Randy Wetmore was serving as Interim Human Resources Director. (Wetmore Aff. ¶ 2.) In December 2004, Chief Garzarek expressed to Wetmore and City Administrator Jay Johnson his concern that Deputy Chief applicants Baltimore, then a Lieutenant, and Al Black (Caucasian) did not have three or more years of experience as Captain and thus they did not meet the minimum qualifications for the Deputy Chief position. (<u>Id.</u> ¶ 4; Docket Entry No. 50, Johnson Aff. ¶ 3 .) Wetmore met with the City Attorney, Douglas Berry, who provided his opinion that the City could require three or more years experience at Captain or higher rank and that the City would be required to disqualify applicants Baltimore and Black because neither met the job qualifications. (Wetmore Aff. ¶ 5; Docket Entry No. 49, Berry Aff. ¶¶ 4-5.) Johnson concurred in Berry's opinion and informed Wetmore that Baltimore and Black should be treated the same. (Johnson Aff. ¶ 2.) Baltimore and Black were disqualified from consideration for the Deputy Chief position. (Wetmore Aff. ¶¶ 6-7; Johnson Aff. 4.)

On January 6, 2005, Wetmore sent a letter to Baltimore explaining the decision to disqualify him for consideration for the Deputy Chief position. (Docket Entry No. 67, Ex. 9.) Thereafter, Garzarek met with Baltimore on January 15, 2005 and explained to him during a two-hour meeting why he did not qualify for the position of Deputy Chief and why a more natural progression for him would be to compete for Captain in the future. (Garzarek Aff. ¶ 11.) On January 18, 2005, Garzarek

wrote a memorandum to Black and explained to him that he also would not be considered for the position of Deputy Chief because he had not served as Captain with the Fire Department for three or more years.[4]  (Id. ¶ 12.)

In February 2005, Chief Garzarek promoted Todd Horton (Caucasian) to the position of Deputy Chief.  (Garzarek Aff. ¶ 2, 16; Wetmore Aff. ¶ 3.)  Wetmore attests that, but for the advice of Mr. Berry, Baltimore and Black would not have been disqualified and would have been considered for Deputy Chief.  (Wetmore Aff. ¶ 8.)  According to Garzarek, Horton was better qualified to be Deputy Chief than Baltimore due to substantial differences in their qualifications. Horton had in the past served as Co-Fire Chief, Acting Deputy Chief, Assistant Chief and Administrative Services Officer, and he had exercised numerous essential job functions that Baltimore had not. (Garzarek Aff. ¶¶ 17-22.)  Garzarek did not believe that Horton and Baltimore were similarly situated in experience and qualifications.  (Id. ¶ 23.)

Baltimore emphasizes that the Deputy Chief job posting permitted "any equivalent combination of education, specialized training and experience" to be substituted for three years with the Fire Department as a Captain.  Baltimore claims that Chief Garzarek decided not to accept what was listed in the job posting after Baltimore submitted his resume and application for the position, citing the January 6, 2005 letter he received from Wetmore.

Baltimore also contends that in or about the summer of 2005, after the Deputy Chief promotion, the City Recorder, Irma Eichner, was retrieving meeting minutes for Chief Garzarek and Deputy Chief Horton when she stated to Garzarek, "Well, it seems like you're having a lot of

---

[4]The Affidavit actually says 2006, but in light of the entire record, that date must be a typographical error.  The Affidavit also indicates a copy of the memorandum written to Black is appended as Exhibit E, but no exhibit prior to Exhibit F was filed with the Affidavit.

17

problems in your department lately."[5]  (Docket Entry No. 67, Ex. 17, Eichner Depo. at 10.)  She testified Garzarek responded, "Yea, those niggers want to get promoted but they just don't qualify." (Id.)  Neither she nor Deputy Chief Horton said anything to Garzarek in response.  (Id. at 11.) Baltimore implies that this alleged racial comment is evidence of Chief Garzarek's racial basis against him.

The City contends that Baltimore cannot prevail on this claim of discrimination because he cannot meet the fourth element of the McDonnell-Douglas *prima facie* case to show that he was similarly situated to the successful Deputy Chief candidate, Todd Horton, nor can he show that the City's decision to promote Horton was a pretext for racial discrimination.  The same law discussed above with regard to the Chief appointment also applies here.  City decisionmakers were permitted to exercise their broad discretion in choosing a qualified candidate to fill the position of Deputy Chief so long as their reasons for choosing one qualified candidate over another were not racially discriminatory.  See White, 429 F.3d at 240; Wrenn, 808 F.2d at 502; Bush, 2006 WL 316871 at *10.

There seems to be little dispute that Horton's qualifications were superior to Baltimore's, as Baltimore has not even attempted to compare his credentials with Horton's to show that he was as qualified or more qualified.  But taking all of the facts in the light most favorable to Baltimore, the Court must conclude that he has generated a genuine issue of material fact for trial about whether Chief Garzarek and city administrators acted solely on the basis of Horton's qualifications in selecting him as Deputy Chief or whether they also impermissibly considered Baltimore's race in making their decision.  The job posting allowed for substitution of equivalent experience.  Baltimore

---

[5]Eichner actually testified that this incident occurred in the fall of 2005.  (Id. at 9, 13.)

asserts that after he applied, Chief Garzarek, Johnson and Wetmore reached the conclusion that they could disregard the experience equivalency provision and require three years of experience as Captain. The evidence shows that, in past years, individuals were allowed to skip ranks, and Chief Garzarek is alleged to have made a remark to another city official indicative of his racial animus against African American firefighters seeking promotions. Although Baltimore did not link the alleged racial remark directly to him, a reasonable jury in light of all the evidence could find that racial discrimination was a motivation in the decision-making process at the Fire Department. Therefore, the City is not entitled to summary judgment on this claim.

### 5. Assistant Chief promotion in 2005

Baltimore applied for the Assistant Chief position in 2005. That year, Chief Garzarek used an outside company to design new promotional tests for the rank of Lieutenant, Captain, and Assistant Chief. (Docket Entry No. 67, Ex. 18, Harmon Depo. at 67.) The promotional tests were not "content validated," and the new Human Resources Director, Shirley Harmon, later learned that, unbeknownst to her, Chief Garzarek served as the subject material expert for the tests with the outside agency, which is an unacceptable practice. (Id. at 60, 77-78, 88.) Ms. Harmon also learned of certain security issues in the way the tests were handled. (Id. at 68-69, 81-82.) The original tests were supposed to be mailed to Ms. Harmon and not opened by anyone but her. (Id. at 82.) She learned, however, that Deputy Chief Todd Horton gained possession of the examinations and made his own copies before the tests were given. (Id. at 82-84.) More than half of the individuals who took the tests failed, and all of the African Americans failed. (Id. at 76.) As a result, the promotional testing process was stopped. (Id. at 75.)

19

After the Assistant Chief examination was voided and the position re-posted, Chief Garzarek and Ms. Harmon removed the equivalent experience language from the job description and replaced it with a requirement that a qualified applicant must have served one year as Captain. (Id. at 58-67.) Baltimore was informed that he no longer qualified for the position because he had not been Captain for a year. In February 2006, Chief Garzarek promoted Captain Mike Culberson (Caucasian) to Assistant Chief. (Docket Entry No. 67, Ex. 10.) Baltimore claims Culberson had previously been allowed to skip ranks and he "had been in criminal trouble just eight years prior to this promotion," whereas Baltimore had not been in such trouble. (Docket Entry No. 67, Plaintiff's Response at 9.) Baltimore also notes that Garry Neal, a Caucasian firefighter, was promoted from Lieutenant to Assistant Chief in 2000, skipping the rank of Captain, and Neal believed that Baltimore possessed the necessary qualifications to perform the job functions of Assistant Chief. (Docket Entry No. 67, Ex. 16, Neal Depo. at 7, 14-15.) John Fitzgerald, a former Deputy Chief and Assistant Chief and thirty-four year veteran of the Fire Department also testified that Baltimore was qualified to be Assistant Chief. (Docket Entry No. 67, Ex. 20, Fitzgerald Depo. at 46.) He indicated that constantly changing qualifications for particular positions during the previous several years had added to uncertainty to the promotion process. (Id. at 68.)

As with the Deputy Chief promotion, the same law applies to this position. City decisionmakers were permitted to exercise their broad discretion in choosing a qualified candidate to fill the position of Assistant Chief so long as their reasons for choosing one qualified candidate over another were not racially discriminatory. See White, 429 F.3d at 240; Wrenn, 808 F.2d at 502; Bush, 2006 WL 316871 at *10. Taking the evidence in a light most favorable to Plaintiff, the Court finds that Baltimore has generated genuine issues of material fact for trial concerning whether race

20

played a role in the 2005-2006 process for filling the Assistant Chief position. Therefore, the City is not entitled to summary judgment on this claim.

## D. Discrete acts of discrimination alleged by Cotton

### 1. Lieutenant promotion in 1998

The Fire Department posted a position for Lieutenant in 1998. A minimum requirement was Fire Officer 1 certification. Cotton had completed Fire Officer 1, 2, 3 and 4 classes and was waiting to take the certification test. Deputy Chief Gentry Fox told Cotton he could not participate in the promotion process for Lieutenant because he did not yet have Fire Officer 1 certification. Based on this instruction, Cotton did not apply. He later learned, however, that Jerrol Coats, a Caucasian, was permitted to participate in the promotion process even though he was still awaiting Fire Officer 1 certification, and that the City created a preferential condition for promotion to allow Coats to get his certification prior to the end of the promotion process. (Docket Entry No. 108, Ex. 3.) Chief Don Claiborne issued a memorandum stating Coats was not eligible for promotion because his Fire Officer 1 certification had not been received, but that his name was to remain on the promotion certification list. (Id., Ex. 4.) Coats was then promoted in May 1998. (Id., Ex. 5.) Cotton also produces evidence that Chief Claiborne (Caucasian) was promoted from Engineer to Lieutenant in September 1989 but did not receive his Fire Officer 1 certification until April 1995, (Id., Ex. 6), and Mike Culberson (Caucasian) was promoted from Engineer to Captain in October 1995, but did not receive his Fire Officer 1 certification until December 1996. (Id., Ex. 7.) Cotton was finally promoted to Lieutenant in 2000. (Docket Entry No. 64, Cotton Depo. at 12.)

The City contends this claim is time-barred, but applying the second continuing violation theory under Bell and Spicer, it is not time-barred. While the City is correct that Cotton did not

21

apply for the 1998 Lieutenant promotion, calling into question his ability to prove the second element of his *prima facie* case, <u>see</u> <u>White</u>, 429 F.3d at 240, Cotton presented evidence that Deputy Chief Fox precluded him from filing an application. The Court concludes that such evidence is sufficient to survive the summary judgment motion and create a fact question for the jury as to whether Cotton was unfairly prohibited from applying based on his race. He has produced significant evidence that a Caucasian firefighter with the same or similar qualifications was allowed to apply and that he was treated more favorably than Cotton during the 1998 promotion process. Cotton produced other evidence that Caucasian firefighters were promoted when they did not have the Fire Officer 1 certification. The City is not entitled to summary judgment on this claim.

2. *Captain promotion in 2006*

Cotton applied for promotion to Captain in 2006. As stated above with regard to Baltimore, serious issues arose in the promotional testing and the process was halted. The position was re-posted and an assessment center was developed by an outside company and conducted. Of nineteen candidates, Cotton scored eighteenth. Eleven candidates were promoted to Captain, including one African American. (Cotton Depo. 89-90, 92, 99-100.) The assessment center consisted of several exercises, including a tactical exercise and a company training exercise. (<u>Id.</u> at 94-95.) The candidates were scored by panel members who were not employed by the City. The process also included an interview with the Fire Chief.

Cotton alleges the tactical exercise was unfair because Deputy Chief Todd Horton ran the scenario, Cotton did not feel comfortable with Horton there and Cotton felt stressed by Horton's presence. (<u>Id.</u> at 84.) Horton previously had referred to Cotton as "boy" and kicked him in the rear at a fire station in front of his subordinates. (<u>Id.</u> at 39.) Cotton also believed he had been incorrectly

scored during his performance on the scenario due to false information supplied by Deputy Chief Horton. Cotton also alleges the company training exercise was unfair because when he walked in the room the panelists were talking among themselves and several minutes passed before he was acknowledged. He later realized that the panelists' actions were part of the exercise and he was supposed to command their attention. (Id. at 95-96.) Cotton received a score of 76.8 on the Chief's interview, which was higher than several candidates who were ranked above him, including the candidate who ranked third. Cotton also believed that the practice of assessing points for seniority was unfair. (Id. at 104-105.)

The City contends that, even assuming Cotton was qualified to be Captain, he cannot show he was similarly situated to the candidates who were promoted to Captain. See White, 429 F.3d at 240. This requires a very fact-intensive analysis. To avoid lengthening this already lengthy opinion, the Court will say only that Cotton has generated genuine issues of material fact for the jury on this claim. Summary judgment in favor of the City will not be granted.

   *3. Other incidents of disparate treatment and retaliation*

Cotton complains about a number of other incidents dating back to his hiring in 1987 which he claims demonstrate racial discrimination against him. The City argues that all of the incidents are time-barred. Giving Cotton the benefit of the second continuing violation theory, see Bell, 351 F.3d at 247-248, the Court will proceed to the City's secondary argument that Cotton cannot meet the elements of his *prima facie* case.

To establish a prima facie case of race discrimination, Cotton must show (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) he was treated differently than a similarly situated employee who is not a member

of the protected class.  See Laderach v. U-Haul of Northwestern Ohio, 207 F.3d 825, 828 (6th Cir. 2000).  In the failure-to-hire context, the first three elements of the *prima facie* case remain the same, but the fourth element requires the plaintiff to show that he was not hired and the employer continued to seek applications from persons with the plaintiff's qualifications and/or that a person outside the plaintiff's protected class was hired.

In the Complaint, Cotton alleged that he was not hired by the Fire Department in 1987 until an NAACP representative called someone at the City.  Even assuming Cotton could prove the first three elements of his *prima facie* case, he has not produced any evidence that he was rejected for a position and the Fire Department continued to seek applications from similarly-qualified Caucasian candidates and/or that a Caucasian was hired for the position Cotton wanted.  Cotton alleges that the Fire Department hired him in 1987.  Thus, he has not produced evidence to make out a failure-to-hire claim.

Cotton alleged that he was denied vacation time for Christmas Day in 1991 when then-Captain Wayne Arrington, a Caucasian who had seniority over him, decided he wanted the day off and "bumped" Cotton.  The record reflects that another firefighter swapped days with Cotton and Cotton got Christmas Day off anyway.  Cotton cannot show that he suffered an adverse employment action by Arrington's use of his seniority.

Cotton alleged that he received a shift transfer in 1995 in retaliation for complaining about the treatment of African Americans.  To establish a retaliation claim, Cotton must show that (1) he engaged in protected activity, (2) the City knew he did, (3) the City thereafter took adverse employment action against him, and (4) there was a causal connection between the protected activity and the adverse employment action.  Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007).  A mere

24

shift transfer does not amount to an adverse employment action. <u>Kocsis v. Multi-Care Mgt.</u>, 97 F.3d 876, 886-887 (6th Cir. 1996). Thus, Cotton cannot establish a *prima facie* case. Cotton also alleged that in 2002 and 2003, he was transferred to Station 2, which does not run as many calls as other stations. Again, because Cotton did not suffer a loss in pay or benefits, he has not shown an adverse employment action.

Cotton alleged that he received low evaluations in 1996 and 1997. He nonetheless received a raise, and he was not put on probation. A negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on the employees' wages. <u>Tuttle v. Metropolitan Gov't of Nashville</u>, 474 F.3d 307, 322-323 (6th Cir. 2007).

Cotton alleged that in 2002 then-Assistant Chief Horton denied him the opportunity to train for and act in the capacity of shift commander. Cotton did not lose any pay or benefits by this denial. Cotton has not produced evidence of a materially adverse change in the terms of his employment to make out a *prima facie* case on this claim. <u>See</u> <u>Kocsis</u>, 97 F.3d at 886-887.

Cotton made two other allegations that he was not allowed to teach a training class or join the training committee in 2001 and two subordinates went over his head to get him transferred to another station in 2002. However, Cotton has produced no evidence that these incidents were the result of his race. Accordingly, he has not made out a *prima facie* case as to either incident.

To the extent Cotton seeks to recover damages on these incidents as separate claims, the City is entitled to summary judgment on each of them.

**E. Cotton's hostile work environment claim**

To establish a prima facie case of a hostile work environment, Cotton must show five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcome racial

harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999). Whether a work environment is hostile or abusive can be determined only by looking at all of the circumstances. Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). Here, Cotton perceived the work environment as racially hostile, and the racial harassment alleged was severe and pervasive enough to be actionable. See Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81 (1998); Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000).

The record contains evidence that Former Chief Don Claiborne, Chief Rocky Garzarek, and Captain Wayne Arrington made racial remarks or jokes. There is evidence that Fire Department managers used the words "nigger" and "boy" when referring to African American firefighters. See Ash v. Tyson Foods, Inc., 546 U.S. 454, 126 S.Ct., 1195, 1197 (2006) (holding evidence that plant manager sometimes referred to employees as "boy" was potentially probative of discriminatory animus). There is also evidence that when African Americans missed work on Monday, those days were referred to as "pimp days"; membership in the Ku Klux Klan was mentioned at work; a black cherry cola bottle was labeled "Jesse Juice," "Coalition Cola," and "Sharpton Soda"; Chief Don Claiborne referred to two African American firefighters and a Caucasian firefighter sitting together on a bench as an "Oreo cookie"; and after the Caucasian wife of an African American firefighter stopped by a fire station and revealed her marital difficulties, an engineer stated, "That's what you get for marrying a nigger." The City's Human Resources Director testified that she is concerned that racial harassment training is not being taken seriously at the Fire Department.

The City contends that these incidents are isolated in time and severity such that Cotton cannot establish a hostile work environment claim. Looking at the totality of the circumstances as required by Morgan, 536 U.S. at 110 and Jackson v. Quanex Corp., 191 F.3d 647 (6th Cir. 1999), the Court concludes that whether a hostile work environment existed at the Fire Department is a question for the jury. Accordingly, the City's motion for summary judgment on this claim is denied.

## III.  CONCLUSION

For all of the reasons stated, Defendant's Motion For Summary Judgment As To Plaintiff Greg Baltimore (Docket Entry No. 37) and Defendant's Motion For Summary Judgment As To Plaintiff Rick Cotton (Docket Entry No. 60) will be GRANTED IN PART and DENIED IN PART. Summary judgment will be granted on both plaintiffs' § 1981 claims. Cotton's hostile work environment claim will proceed to trial, but Baltimore's hostile work environment claim fails for lack of subject matter jurisdiction under Title VII and because of the time-bar under the THRA. Baltimore will be permitted to challenge the City's failure to promote him to Lieutenant in 2000, Captain in 2002, Deputy Chief in 2005 and Assistant Chief in 2005. Baltimore was not qualified for Fire Chief in 2004 and he will not be permitted to proceed with that claim before the jury. Cotton will be permitted to challenge the City's failure to promote him to Lieutenant in 1998 and Captain in 2006, but his other claims of disparate treatment or retaliation are barred for failure to establish a *prima facie* case.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE